Good morning Mr. Boxer Good morning, your honor. So you've got ten minutes but you've reserved two minutes for rebuttal. I have. So you have eight minutes out of the gate. Let's just set the clock and then we'll let you go. You may proceed. Thank you. May it please the court, counsel, good morning. The two gratuity convictions at issue in this case were the product of critical and serious errors and require reversal. With respect to count four, the one involving CBS radio, the jury asked a very specific, discreet note during its deliberations whether the mere acceptance of these strips by itself was enough to find Mr. Kaufman guilty of a gratuity. And instead of answering no, the court recharged on four of the elements, even though there are no reference to only two, and did not charge the safe harbor provision, which we believe was basically the central feature of our defense to that count. These were not ordinary experiences in a typical bribery case. These were trips that were promoted by CBS radio, sanctioned by CBS radio. CBS radio executives were there. Executives from other big advertisers were there. Mr. Kaufman and his wife attended some of them. They clearly are against Melrose's internal policies, right? Exactly. Is that not relevant to whether something is in the ordinary course of business? It is relevant and admissible to his intent. But the safe harbor provision and what it provides and what they're required to disprove beyond a reasonable doubt about ordinary course of business for this kind of trip with these people there, discussed openly, was central to the defense. There was no request that the safe harbor provision be re-read to the jury when that note came out, right? That's correct. And let me say two things about that, Your Honor. First, I think it's plain error on this record, irrespective of whether it was preserved. I mean, what we're talking about here is the jury asking— Well, there are some cases we cited where mistakes were made in subsequent jury instructions. There was no error in the instructions. In fact, the judge did tell them no in response to the question because the district court said at the end, in any event, however, that the government proves that the defendant solicited or accepted a trip guide of more than $1,000 and fails to prove beyond a reasonable doubt any one, two, or three of the other elements of the offense, then you must acquit. That is— That's incorrect. That's an incorrect statement of the law because they still had to find beyond a reasonable doubt that the safe harbor didn't apply. But no, what that says is mere acceptance of $1,000 alone is not enough to convict. That's what that says. You have to find— Yeah, but he— If that's true, they also have to find the safe harbor. I agree with you on that, that safe harbor doesn't apply. But certainly, the judge did not suggest to them that accepting $1,000 is enough to convict. The judge said the exact opposite. So I don't think there's any error in anything the judge said. You just object to the fact that the district court pointed them to the other elements in addition to answering the question. No, right? I believe, and I don't have the record type for the page, but he told the jury— It's 1236. Okay. Thank you. In the event the government proves beyond a reasonable doubt all four elements, you should commit. And that's an incorrect statement. And what we have here are these marketing trips and a risk of a policy violation turning into a four-year prison sentence for committing— Do you think there's some reason to believe that the jury just forgot the safe harbor instruction that they had and that was in charge? There's no reason to speculate what they forgot or didn't. But they asked a very specific question. Is the mere acceptance by itself sufficient? And that's directly focused in on corrupt intent. Can I ask, are you asking us to create new law for the safe harbor exception? I don't think so. What I hear from you is if the provider, I guess, of the trip in question offers something that's consistent with their policy, then the acceptee of that can't be convicted? No. I understand your question now, and we didn't move for Rule 29 dismissal as a matter of law because other people were there. But it's central to the state of mind of the defendant. It's not, you know, get me this loan, and I'm going to send you skiing for two weeks, you and your wife, and all of that. Didn't they respond by saying, hey, what kind of investment are you going to get in response for the Super Bowl trip? They did. And although the record is inconsistent on this, the way CBS structured it was that when you reach certain thresholds of advertising, you qualified for the trip. So I appreciate that the bank policy doesn't permit that. I guess the part I'm struggling with is the bank policy doesn't permit it. You agree that the safe harbor exception isn't so expansive as to per se exempt out something if the offeror's policy allows it. So where is the realm that you are operating in within our existing law that makes the safe harbor apply here? It applies because the evidence, I thought, was clear that all of the circumstantial evidence, even instances where Mr. Kaufman refused to increase incremental spending and was still requesting a trip, all of that negated proof beyond a reasonable doubt of his corrupt intent that he's taking this as a reward. There's evidence in the record that CBS radio advertising was very effective for Melrose. It drove hits to its website. There's nothing in the record that this was a frivolous expense. And so the presence of all these people who were also... The judge instructed that the elements included intent. The safe harbor provision, maybe I'm misunderstanding, it doesn't deal with intent. It deals with whether or not it was in the usual course of business. I think you said to Judge Sullivan, it's undisputed, that this was contrary to Melrose's policy. It's contrary to Melrose's policy, but the jury still has to find beyond a reasonable doubt that Mr. Kaufman didn't understand that it was not in the usual course of business. It's not an objective fact that needs to be... The judge had instructed him on the element of intent, even in reference to the note, included instruction on intent. So I just don't understand how this safe harbor provision could have come into play in this case, based upon the facts. I disagree. It was central to the defense and to Mr. Kaufman's intent. To him, the evidence showed that it was in the ordinary course of business. Should he have done it under the bank policy? Should he have given the bank notice? How can it be in the ordinary course of business if it is against his policy? Because the CBS radio is promoting it and people are attending it from all business areas. That's relevant to his intent. But lots of businesses don't have this policy. So that's why I was surprised that you're not trying to argue that ordinary course is limited to what CBS's ordinary course of business or usual dealings were. You're conceding that Melrose's policy is relevant, and you're not arguing that he was confused or misunderstood the existence of Melrose's policy, right? There was evidence in the record that he had signed the attestation regarding the policy. So that's not in dispute. But this is not about whether or not it violates the policy. It's about what was Mr. Kaufman's intent when he accepted the trip. Did he have corrupt intent that he's now being rewarded for something that occurred? And that's something there was evidence that it was very valuable advertising. There was evidence he didn't always increase the spending. And there's also evidence that the rest of the world, so to speak, is going to these trips. CBS is sponsoring them. And that is relevant to whether or not it's an ordinary course and he has corrupt intent. I appreciate that there's plenty of good summation arguments coming from the bench for the government to make at the trial. But at the moment the jury is focused on this. They're asking the specific question. Is the mere acceptance by itself enough? Nobody, the government, the district court, nobody has said that the answer to no was incorrect. I haven't heard that from anybody's presentation. It was incorrect. The use of the word mere and by itself was not sufficient. So they point to where charges about corruptly. They're in the right place. The judge told them to do that if they had questions. And then we get the four counts, the four elements of the charge. If you find those beyond a reasonable doubt, you should convict. And there's no mention whatsoever about the safe harbor. The safe harbor goes hand in hand with the statute. That's why it's there. It's part of it. In our request to charge, we put it right after the four elements. In the government's request to charge, they didn't include it at all. And if you read the record, we had the charging conference, I think it was the day before the summations. Judge Kaplan finishes the conference, and I'm standing up to ask where's the safe harbor charge, and he anticipates what I'm going to say. I'm going to put in the safe harbor charge. But, again, you're saying it was plain error for Judge Kaplan not to give the safe harbor charge again in response to the no. But you didn't ask for it, and so was it malpractice on your part not to ask for it? No. Was it plain error for you not to do this? No. I'd like to address that. But just one thing further, when he did give the safe harbor charge, he did not charge that it had to be disproved beyond a reasonable doubt. That's an additional error. As far as my standing there in the 30 or 40 seconds where this is being debated, and you can see from the record things move quickly in this courtroom, and I don't say that as a fault, but it was a moment's decision on my part. I stood up and said the answer is no. My view is that now the government wants to be retried from four elements. The judge is considering doing that. If I'm engaged in negotiation about what the four elements should be and how it should be, I've waived my ability to say it's a simple no. I'd be up here saying, well, you could have stuck with no. And now you're engaged on what the elements should be, so you've waived that argument. So that's what's in my head. And then, as you see in the transcript, the judge tries to negotiate with me a little bit to improve on the language. I say something like, well, that's better. And he says, but are you still objecting to me doing what I said I was going to do? And I said yes. And he said, okay, then I'm not going to do that. He tried to negotiate with me. I'm sorry. Judge Sullivan, I accept and respect the question. But in my view, I maintained my objection. I'm not required to propose alternative language. And I think to call that a waiver, I think, would be inappropriate. Well, I thought you conceded that plain error was the right standard. We didn't. We argued both. But I do think it's plain error. Can I ask you about the 215 and the continuing offense? Do we have to decide that question today for us to rule for you? I don't think you do, because based on the verbs of the statute, even as a continuing offense, once Mr. Kauffman accepts, that ends the venue or inquiry. Wait, once he accepts what? Okay, so the government's allegation was that he accepted free rent at this house in Jericho. Does that happen every day? No, it happens when, as the testimony described, it happens when Georgetown offers it, and Mr. Kauffman accepts it. That's accepted. Isn't it every month? No. I pay it every month. And so if I get free rent, it's not the continuing benefit to me? It is a continuing benefit, but it's not a continuing gratuity. He accepts as a reward the free rent under their theory. The day he tells Mr. Georgetown, yes, that's a great idea. And that's whether it's one month of free rent or ends up being two years of free rent? Well, if the deal changed, maybe that would be a different gratuity. But it was the same agreement right from the beginning. You pay the expenses, Mr. Kauffman. I won't charge you rent. When I need to sell the house, I'll let you know. Full stop. And that's how it was. He said, great. He said, yes. I know, but then he bought his house, and the closing took place in the southern district. So now I'm going to let you buy the house. You need money. I'm going to loan you the money for the house, and the closing takes place in the southern district. That doesn't create venue for the house that he is buying? It's not the acceptance. Because when Georgetown says, I need to sell it back to you, and I'm going to sell it back to you for the price I bought it at $630,000, Mr. Kauffman says, okay, accept it. That's the verb of the statute. It's not continuing the fact that there's a closing later in Manhattan. He was acquitted of the conspiracy. If I'm giving someone a car as a gratuity, and they come to pick it up at my house in the southern district, that's not part of the offense? I don't think so. I don't think so. Look, he was charged with a conspiracy. He was acquitted of the conspiracy. I think under the law, to answer your question, when he accepts, that's venue. Now, looking at the law and continuing offenses, I appreciate there's a Second Circuit case on bribery that found it a continuing offense, and there's district court cases that say it as well. I don't think it would be unreasonable to conclude for a gratuity offense that it's not a continuing offense. You give somebody as a reward. It's not an ongoing course of conduct. It's not the allegation. Even bribery, which he was acquitted of, requires both the thing of value, and let's use Mr. Kauffman, he has to be corruptly acting at the credit union in exchange for that thing of value. So for bribery in the Stevenson case, I understand the logic. It just doesn't happen at a moment in time. There's both sides to the quid pro quo. But with the gratuity, it's he correctly solicited demand and accepted and agreed. Those are the verbs. So I don't think it's a continuing offense, but the answer to your question is I don't think you have to reach that conclusion to still find this correct on venue. If I just may, before the time runs out, I think the other critical The time ran out a while ago. Oh, I'm looking at it to save me. Look, we've set the times, but as long as judges are asking questions, then I'll have the flexibility to allow it to go. I appreciate that. So what do you want to get to? I think exclusion of our experts was prejudicial and inappropriate, and I think the government did vary from the indictment and constructively amendment. We had an indictment that had basically two malfeasances. Mr. Kaufman gave Mr. George interest rates that were too low and amortization periods that were too long. And in paragraph 11 of the indictment, it says those things. It says, and the loan did not comply with Melrose CEU's loan policy. Exactly. So we asked for a bill of particulars. The government said one of them was necessary. It's a speaking indictment. There are six million pages of discovery. But you have the policies. Are you saying you aren't aware of what the loan policies were? No. Until they opened, we did not know that what was favorable, what they were contending was favorable, was loan-to-value ratios, cash flow coverage, and the size of the balloon bank. About four days before the trial started, they put in a letter on the expert issues, saying this is what we intend to show in terms of contrary to policy. No? It may be. I don't think that's quite right. They wrote a letter. Judge Kaplan, the expert issue lingered for quite a while. But right before they rested. The government expects to introduce evidence that the defendant approved loan terms for Georgentine that were not generally available to other Melrose members on violation of Melrose's loan policies and procedures and were rejected by Melrose's chief loan officer. That was in the reply before the trial. Right. No, that's exactly what the indictment says. But it doesn't say anything that... Let me take a step back. Our defense, similar to the other counts, was that Mr. Kaplan did not give Mr. Georgentine anything special. He was giving him things that everybody was getting, especially big customers.  It could be a gift. It could be a policy violation. But the predicate of the offense was not there. And up until they started the trial, what apparently Mr. Kaplan gave was favorable interest rates and 50-year amortizations. And our expert focused on that, did some comparative analysis. It was central to our defense. They repeated interest rates and amortization period in their letters pretrial. And when they saw what our expert put together, which kind of put the lie to interest rates and amortization periods being favorable, we were met with, well, they're out of policy because loan to value, cash flow coverage, and balloon payments. Those are all things that are part of the policies? There are policies on them, but they're sophisticated. They're not so easy for a jury to understand. And we don't have a chance for our expert to pour in for all the loans like you did on interest rates to present whether this is even accurate. Isn't it the same thing? Like, you started off this conversation with he wasn't giving him something that was not given to everybody else, but you were on notice for the fact that they were out of policy. Like, doesn't out of policy by definition mean not something given to everybody else? It does. I guess what I don't understand is why wasn't this like a failed strategic decision rather than something that was actually prejudicial? Because we didn't have time when the trial already started to meet the allegation that loan to value ratio and cash flow coverage were what our client gave to Mr. Georgeton. I mean, it can't be that you have 6 million pages of discovery, you have two specific examples in an indictment of the problem, and then a catch-all that it's out of policy. We ask for bills to particulars, they say no, it's a very speaking indictment. And now they come up with these three sophisticated loan terms during the trial, and that's okay. And just to put a period on it, I've never seen this happen before, but right before the summations the government stood up and asked the judge to remove the speaking portions of the indictment and that the jury should just get the charging language. Now, you've experienced a lot more criminal cases than me, but in my experience the government always wants the speaking part of the indictment to the jury because it lays out the logic and the facts to get them to the charge. They knew that those, I can't say they knew, my interpretation of it is they knew that interest rates in 50-year organizations were disproved, and they were summing up on long-term value, cash flow coverage, and balloon payments. And they didn't want what we disproved in front of the jury. I appreciate the indulgence for the extra time. Of course, if you have questions. Other questions? All right. Well, then we'll have a stop by after we hear from the government. Thank you, Judge Sobel. Thank you. Thank you. Ms. McLeod?  How do you pronounce it? McLeod. McLeod. May it please the court, my name is Dina McLeod, and I am the United States Attorney in the Southern District of New York. I represent the government on appeal, and I represented the government at trial. So, unless the court has any questions right off the bat, I can jump right into a few things I think that are worthy of some clarification. I think the court is very attuned to the jury note issue and the fact that Judge Kaplan was responding to a specific question. In effect, what the defendant seems to be suggesting here is that in response to a specific question, Judge Kaplan should have essentially given a full recharge of the entire jury instruction. He should have recharged on the reasonable doubt standard, and he should have recharged on safe harbor. But trial courts have to use their discretion and their judgment in responding to specific questions in what part of the charge they recharge. Do you think it would have been wrong for Judge Kaplan to answer the note with a simple no? I don't think it would have been wrong, but I don't think it was error for him to recharge the way he did. And I think what Judge Kaplan said, and said many times because this was a subject of discussion, was that he thought that the reference to second and third element was clearly a question about the interplay between the elements, and that's why he recharged it in the way that he did. So there was no error there, let alone plain error. In terms of the safe harbor, again, I think that your honors are, again, very attuned to the specific issues there, which relate specifically to evidence that was particular to Mr. Kaplan that did not apply to CBS radio. There were specific bank bribery policies in place. There were specific policies in the employee handbook in place, none of which it is disputed the defendant knew about. And in violating those policies, it provided more than enough evidence for the jury to find that this does not fall within the framework. So how do we prevent the question of impermissibility being lockstep with what a policy is? You can understand why we would be nervous about too close of a connection between what a policy is and what we're able to find. So how is it that you are asking us to think about this in a way that doesn't de facto make the institution's policy the question of whether or not this was impermissible? I don't think I'm asking that in any given case that if a policy is violated, that is de facto. But certainly in this case, this is a sufficiency of the evidence question. And here, the evidence of the defendant's intent on this point was about the policy in some sense. I mean, there were other parts of it too, but I think what is sort of now the central point of argument on appeal is this question of the policy. I'm more concerned about the other way. What happens if the policies are very, very general? Like, how do we prevent the policy from dictating the legality? I mean, we have to write an opinion that threads this needle. So what are you suggesting to us is a way we handle the relationship between what the institution's policy is and what the law allows? Yeah, I mean, I think that's always going to be a highly factually dependent question. So, for example, you could imagine a scenario where there were differences in the way CBS radio conducted its business. Maybe they conducted things in ways that were somewhat more secretive or things like that that would apply in other cases. In this particular case, the key point was about what did the defendant know when he took these gifts? And he knew that he was violating not only the bank's policy, but the bank bribery policy, which specifically actually referenced Section 215. And so that was the crux of the argument on safe harbor. And there's actually not much dispute on, really, the facts around that. It's just a question of- There's not much law around that either. The safe harbor, I mean, there's not a lot that's been written about this statute or the safe harbor provision on it. Not on instructions, but the subject of judicial opinion. That's true. This isn't, as I'm sure both me and Mr. Boxer would agree, we have done a lot of research on this statute. And there's primarily in this district and, frankly, across the country, gross is sort of the main other case that was about Section 215, which was a case in front of Judge Nathan. But we agree, and that's why in a lot of our pre-trial briefing, we have to rely on analogies to other statutes that have similar language and similar legislative histories. Can I ask you about- Mr. Boxer, I think it's accurate that the government never, pre-trial, pointed the defense to which policies the government was claiming were being violated by these 15-year hundredization loans. The LTV ratio, the cash flow coverage, the balloon terms. He's saying for the first time here at the trial. I think that's accurate, isn't it, or not? I don't think that's accurate. So the specific policy that was violated is the loan policy, which everyone had. The government kind of narrowed, I think he's also correct, the government narrowed the theory that an indictment says the interest rates on the loans are too favorable. You can correct me if I'm wrong. I think the government did not pursue that at the trial. That is correct. That's right. In the sense that there was evidence about the interest rates in the sense that the credit memoranda had the interest rates on them, but the government didn't argue that point at the focus of the case. So it became then the issue is violations of the Nellers' policies, and he says we didn't know which ones they were claiming were violated until the trial. What's your response to that? So I think the first thing I would say is that the question of how the policies were violated are, frankly, the very, very particulars of how the crime was affected, as opposed to the core criminality, which I think if this question is sort of about the variant amendment issue, what is required is notice of the core criminality and not how, in particular, a crime is affected. But I do think in this case, to answer your question, the indictment, which came down in 2019, with notice of the out-of-policy loan compliance being an issue in the indictment, combined with quite a bit of discovery, which included depositions from the NCUA, which was the regulator, which included the credit memoranda themselves, of which there were less than 20, which were really at issue, and which could easily have been compared to the loan policy. So this isn't a question where the documents weren't before defense counsel. Defense counsel could not have figured this out. They had the loan policy. Those are pretty technical things, right? LTV ratios. Even if they have all these documents, they wouldn't necessarily know what the government is going to focus on, and if they wanted to have an expert look at LTV ratios, it would have been certainly helpful for them to know that those were the particular policies that were going to be the focus of the trial. Yes, perhaps. Although whether or not that would have been helpful is not the standard. The question is whether they were on notice of the core criminality, and they were. And in fact, the defense put on an extremely robust defense. They were extremely familiar with all of the credit memoranda, with the loan policy. They were very into the weeds on all of the documents. But that theory basically took their expert out of the box. The government's position with their expert is now irrelevant because the expert is going to testify about favorability towards the market, and the government is saying we don't care about that anymore, right? Well, that was one of the grounds for it being excluded. I think one of the larger issues was even setting that question aside, it wasn't clear what the proffer was, and what the exact opinion and bases of the opinion were. And so in that sense, there's a bit of an interplay between the Rule 16 disclosure issues and the relevant issues, because Judge Kaplan was attempting to make sense of what the exact proffer was. And it was difficult, I think, on this record for him to determine that he could say, you know, I've been performing my gatekeeping functions, this is absolutely relevant. And there was, Judge Kaplan heard lengthy oral argument during the trial on this issue, and really attempted to try to figure out exactly what was being proffered. And he said at the end of the first of those oral arguments, I'm telling you my preliminary view is that the Rule 16 disclosures are seriously deficient. And even in his post-trial motion, he noted again, it's still somewhat of a mystery to me what the expert would have said. And so given that record, I think it's really difficult for Judge Kaplan to have made the relevant assessments that were required of him under Daubert. Can I ask about the same question I asked your colleague? 215, continuing offense, do we have to decide anything new for you on that? No, I agree with Mr. Boxer. We don't have to decide that because, but we are both arguing that the acceptance is sort of the point here. We are just arguing different things about the acceptance. I think the defendant is taking a bit of a strained view of what acceptance can mean under the statute. But I don't think you have to find that the continuing offense, given both parties are pointing to a specific sort of discreet part of the law. Every month, every day, because he's living rent free. So certainly, certainly the government argued that there were numerous gratuities that happened. So there was not just the 2010 acceptance of the house, which is when Georgia can purchase the house for Kaufman. But then in 2013, he, in essence, accepts the house again because he buys the house. I get that. So the first time he's living rent free, it is entitled to the house. Right. And so presumably the person who has title can kick him out at any time. Presumably. And so does every day that he's not kicked out constitute an acceptance of a gratuity? That's an interesting question. I mean, I think that's possible, especially since he's also accepting the rent free sort of benefit every day. I think for. Well, most people don't live rent free. Most people don't have costs associated with living in a nice residence. Yes. But I'm just trying to nail down, what is your theory of when these acceptances took place? So. Maybe you should just focus on what did you argue to the jury? Well, and also if I could put a fine point on top of what he said, the acceptance that's in the southern district, which. Yes. So the, I think the reason there was this focus on the acceptance at the closing is because it interplayed with the venue issue and because the closing occurred in Manhattan. And so the sort of the question. Let's be clear on that. Which closing? The 2010. Yeah. Correct. So it's not after he, the title was transferred to Kaufman. It's before that, right? Correct. The trans, the transfer of the purchase of the house. It's his closing. Correct. And Kaufman is there with the real, with the real estate broker that he identified and with a lawyer that he provided. Correct. And so, and so there's no house to begin. Correct. And I think what judge Kaplan found is, you know, there can't, there can't be anything. This is clearly the acceptance there. I'm not sure what could be more central here than the acceptance of the house, which the government argued to the jury, this is the bribe, the gratuity. And. And so. Even if the ongoing living in the house was somehow the gratuity that that was preparatory to the gratuity. In other words, you can't live in the house, the house went free once it's purchased. Well, you need the keys, right? No, seriously. Yes. Yes. That's right. And, and there's also this sort of separate issue of the fact that gratuities are forward looking and backward looking. And so the sort of, sort of exact pinpointing in time is less important because it can look forward or backward. But. To the experts, though, because I do want to make sure I understand. So let's go with it. And. Whose proper testimony is that he's going to talk about the value of naming rights. So generally, and in this particular case. And so I guess my question is, why is that relevant? In other words, if these, this was a great deal, this was a terrific naming rights deal, but it's a gratuity paid so that Melrose will purchase naming rights. Does it matter that it was a good deal? No, it doesn't matter. And. It especially doesn't matter. Because it was a post hoc opinion of what the, of what the value was. And there was no nexus to the defendant. Or his knowledge at the time. And I think as we pointed out in our brief, the reason why this email from the marketing director,  Was not in and of itself that it proved some sort of objective value. It wasn't a valuation of the naming rights, but because that opinion was conveyed to the defendant contemporaneously. And so it related to him. He went forward with the naming rights agreement. Knowing that his marketing director. Was completely against it. Essentially thought it was supposed to get an opinion that it was valuable for Melrose. Where it's still been a crime for him to take all those trips. From CBS or not. So I think, so, so this is the, the, the other side of the transaction on count two was, was Georgetown. But I think. Certainly that would have taken away a powerful argument from, from the government, but from a legal perspective, the benefit to the credit union as, as the judge instructed, and which was not contested by the defendant. It is of no moment. It can be desirable or beneficial to, to the credit union ultimately. But that's irrelevant to the question of, of intent. So I hope I answered your question on Mr. Zoltowsky. Yes. I think it's kind of hard to pin down. What is the basis for not allowing the expert. I pronounce it. Wedge. Okay. So are you saying that just rule 16 failure to properly disclose. Detail and timely is alone enough of a reason to. Affirm. What judge. So, so yes, the rule 16 disclosures being deficient. Is an independent ground to, to exclude and, and. But then we used to be, there's usually some criteria associated with that, including like how prejudicial, how much time, you know? And so it didn't seem like just Catholic did much of an analysis on that score. And I can give sort of a little bit of the detail. There's a little bit of a timeline in, in the brief, but essentially this was a. Many month long process of attempting to get the disclosures from the defense, which August 17th, 2020 letter. You've got the January 19th, 2021 letter. We've got a March 23rd, 2021. Trial starts March 16th. And, and, and just to also fill in some other facts that might be useful in terms of. The defense is sort of being on notice that this was an important issue. So the government moved in limine February 19th, 2021, just on the expert. Because other motions in limine had already been filed. So on February 19th, we moved in limine just on this point. And one of our points for both Wedge and Boltowski was that the rule 16 disclosures were inadequate. And then it wasn't until two days before trial that we received anything else. And then, as I noted, the court heard argument throughout trial on both. Throughout trial. So, I mean, so it's hard to say that this was a sort of a clean rule 16. Situations where somebody's just late to the game and it's just too late. And the answer is no, we're not doing this now. Today is the first day of trial. You're telling me about experts now. No, but that's not what happened here. I think the issue wasn't so much that there wasn't any notice that there was this expert issue looming. The substance of the disclosure was what the main concern was, which was that repeatedly we were getting these extremely general and bare bones disclosures way up until trial. It was very difficult to assess what was the opinion that was being proffered. And even when the slides were provided, they were unmoored from any explanation or methodology. So it was difficult to tell. Is there an opinion that was going to be offered on this slide? If so, what is it and what is the basis and methodology? So I think it's not so much, hey, we're bringing the idea of an expert on you in the middle of trial. It was, you have known for so many months now that this was an issue that we didn't know the basis and methodology. The government told you in August 2020 that this was insufficient and we needed to know the basis and methodology and cited to Rule 16. And so we're not getting anything and we're halfway through trial. But even, I think, sort of setting the... Well, I'm looking at the March 23rd letter where it says Wedge is going to basically give testimony about foundational concepts of amortization loans. He's going to compare the alleged favorable loans to other loans that Georgetown received and the loans that MCU customers other than Georgetown received. And that this is mostly, I guess, an exposition of principles and relevance to the case. It's not clear from the March 23rd letter whether there's going to be an opinion. It's just going to be an explanation. But that doesn't rule out expert testimony, right? That's correct. The problem is that it does make the district court's job difficult, if not impossible, because he needs to figure out is there an opinion that's going to be given because he needs to vet the opinion. So I think the... And the question... And I think part of my response in terms of the relevance here, and apologies if I haven't been as precise, is because there are a number of different things which they offered the expert for and there are sort of perhaps different explanations as to the relevance for each of them. So, for example, one of the things that they point to is the question of this. They wanted to have the expert compare the loan terms prior to the house purchases and after the house purchase to show that the terms were not any more favorable after the house purchase. And just as an example on the relevance point there, all of that... First of all, there was no need for an expert for that. It was merely looking at the loan terms and comparing them. So it's basically just a summary witness could do that? A summary witness could have done it. Even a lawyer could do that. Indeed, he did. And so... And similarly, the court was, I think, very concerned about the profits to Melrose in terms of 403 balancing because it would... Essentially suggesting, well, it would have made so much money for the credit union that there couldn't have been corrupt intent. And that, I think, coming from an expert would have been misleading and confusing. And so that 403 balancing was appropriate. But so all of that to say, there were, I think, and the court addressed sort of specific slides and specific arguments in his briefing. But because there were so many of them, it's sort of difficult to sort of have a catch-all in terms of the relevance. But the court certainly was attuned to this issue, considered it at length, and appropriately performed his gatekeeping function under Dauber, which I think Judge Kaplan took very seriously. So unless your honors have any other questions, I thank you for your time. Great. Thank you very much. We'll have Mr. Boxer for two minutes? Yes. Maybe? Maybe. First on venue, my very able co-counsel who tried the case with me reminded me of an important response to your honors' question. The jury charge was explicit that in order to convict a defendant, he only needed to accept. He didn't actually need to receive. Similar to the mail fraud statute is how I understood it. You have an intent to take the property, but whether you actually get the property is not what the crime is. So the jury was instructed that once he accepts, they find out the unreasonable doubt and everything else. That's a conviction. So that is consistent with, I think, the arguments I was making, that the verb is accept, and then the crime is complete. And that's actually how the jury was instructed. As far as the experts, I would add just one other notice to your honors' list, which was on March 5th. And that wasn't characterized as a Rule 16 disclosure, but we were under a deadline, court imposed, to produce our defense exhibits. I think they were due about 10 days after March 5th. But as our demonstrative became more robust and seemed more critical, we decided to get it out as soon as the expert was done with it. I am still mystified by the district court's characterization of our disclosures. And I've read Olbrecht, we've read Gatto, we've read a lot of cases. It's not such a high burden, and I think we far exceeded it. But perhaps the last bit of discussion on this topic maybe helps understand it. We never viewed either of these experts as providing an ultimate opinion. We never wanted them to come near opining on what Mr. Tafton's intent was. We wanted them to use their expertise to explain these terms to the jury and to explain the comparisons, so I would have a basis to sum up and argue the inferences from those facts. It's easy to say that I could do that, but Dr. Gwedge, for example, was looking at Excel spreadsheets. January 19th, you said Dr. Gwedge will opine that the terms of the loans made by MCU were similar to or less favorable than loans available at other financial institutions. That's true. But by the last notice, we had abandoned that approach. I think it would have been okay for him to do that, but we were obviously accepting the feedback from the district court, and so ultimately he was there to put in the record his analysis. He looked at all sorts of credit union records to first figure out which were Georgetown loans. The Excels of their portfolio were thousands of rows. It's not fair to say that I could have just stood up there, put up an Excel, and summed up for an hour on, I added all these, I added all that. I would be vouching at that point. So this was, in my view, the only way to effectively do it, and as Your Honor pointed out, it's a totally proper ground for expert testimony for what he did. As far as the naming rights agreement, there was a foundation for it. There was testimony that the board and the general counsel looked at comparable deals. I was not going to ask him, do you think this naming rights agreement was appropriately priced, or give your opinion on anything like that, but I think in helping the jury understand what was going on, based on the record, I think it was appropriate. Wait, I don't understand why it's relevant. So this was a good deal for Melrose, this was a bad deal for Melrose. What difference does it make? What difference does it make for the elements of the offense? They're saying that our client promoted a worthless naming rights agreement as a reward for these favorable loans that our client authorized. So if it's not worthless, if there are things in the agreement itself, even, that give value, the jury would have a basis to rebut the claim that it was worthless. It's as simple as I think I could explain it. The government's position is that it's a crime anyway. I think that's what I heard them say, is that even if it turned out to be favorable to Melrose, it's a violation of Melrose's policy to take gifts and connects with a transaction that he's involved in. Is that wrong? It's objectively correct as far as a policy, but having corrupted... The law, is that a crime or not a crime? That's not a crime by itself. No, wait, I'm going to totally have to cut it. I mean, if you offer a judge a bribe to rule a certain way, it's not a defense to the judge to say, well, I was going to rule that way anyway. No. The offering is the crime. It's the corrupt act. Right. The accepting is the crime. And so I guess in this case here, it seems like you want an extra testimony to show that this was a good deal. And it's not clear to me why the goodness or badness of the deal is relevant to the elements of the offense. Because if there's a basis for the jury to conclude that Mr. Kauffman had facts in front of him that showed that it was not worthless, it could conclude that it wasn't given away in a corrupt way. Well, I mean, it accepted benefits, right? Well, he was acquitted of that. He was acquitted of the bribery. Maybe it makes sense on the last point, maybe this helps. The profitability of Mr. Georgetown's loans and deposits, that was part of Dr. Gwedge's analysis. That corroborated a central defense and also corroborated Mr. Kauffman's testimony that the naming rights agreement, a big motive for it and for the board, was to try to do what their biggest customer, who's leaving the credit union for better deals, to try to keep them at the credit union. And so Dr. Gwedge, he had one page on all the deposits and the interest earned by the credit union. He had one page analyzing the profits from the loans. He's not then going to say, so this naming rights agreement was entered into to keep a good customer. No, he's not going to do that. But it's somewhat sophisticated analysis to figure out a spread of profitability on a loan. He does that work. Mr. Kauffman sits on the ALCO. He's familiar with the portfolio, so it's not like delving into an area that the defendant doesn't have any real-time knowledge about. And it doesn't direct the verdict, but it corroborates and gives the jury and me an opportunity to explain a fair inference from all this, is that it wasn't rewarding Mr. Georgian for these loans. This was an effort to keep them in the bank. Or to keep them out, right? Excuse me? Or out of the house. That is close enough that one gets rent-free homes. Correct. I mean, that was also a central feature of the case, how close they were, how Mr. Georgian's business was built at Melrose through Mr. Kauffman's father. There was evidence that, as it sounds on its face, you got to live rent-free in a house and pay the expenses is one thing. But there was context here. There was history here. But that's what I had. I'm reluctant to delve into my sentencing points because I think we were on the merits. Some of the aspects of the sentencing I think are, particularly the restitution comes to mind, are clearly incorrect, but unless there's any further questions... No, I think we got our money's worth, so thank you all. Thank you. We will reserve the decision. Thank you. Thank you. We'll now move to the next case on our calendar this morning. That is Tafoya, or Tafala, I'm not sure if that's the right pronunciation, versus Hyland. Thank you. Mr. Berkey, before we start, pronounce your client's last name.  Tafola. That's how I do it. Okay. You're no better than we are. All right. So you have ten minutes, but you've reserved three minutes for rebuttal.   Okay. We have two reasonable accommodations for you. One is that you have the right to remain silent, The first one involved plaintiff's office interaction with Joseph Carroll on January 7, 2014, when we argue the jury confined that the defendants violated the ADA when Carroll ordered plaintiff to archive the closed files because the order contradicted the medical note that plaintiff's doctor prepared a couple days ago. Let me ask you about that, Mr. Tafola, because as I was reading the briefs on this, it just seemed like this case... I'm sorry, Berkson. You got Tafola in my head. This case seems to be a disagreement over what the doctor notes said. It seems to me that they were willing to accommodate her, but their view was that she could file folders unless it was more than five pounds. There was some confusion about that. She's telling them, no, I can't do any filing, archiving, and their position was, no, your doctor says as long as it's under five pounds, you can do it. Isn't that really what this... Well, I wouldn't use the word confusion, because if you look, there was sort of a misapprehension maybe of what the doctor's note said, but if you look at the doctor's note, it's pretty clear, page 980, no lifting over five pounds. Well, the second one is less clear, though. The second one, the 983 one, says she's unable to lift, bend, twist, or push any object over five pounds. You know, that's an interesting point, because the second note slightly modifies what the doctor said from the first note. The first note separates out. You have a five-pound limitation. I agree with you. The first note is clearer, because it says no bending, pushing activities. Right, so that's not in the context of five pounds. The second note, if you look at it very carefully, it sort of compresses everything. No, but their position is that your client basically, this is what the interactive process is for, that there's some confusion about what the doctor is saying. The Hewlett memo is basically saying, we're going to give you whatever accommodation your doctor tells you, but it seems to me that they're just confused. They're thinking that she can do archiving under five pounds. Let me just finish my point, because I want you to respond. Their argument is by your client just stopping coming to work, that she eventually withdrew from the interactive process to try to resolve this. What's your response? Okay, let me respond in two ways. Like I said minutes ago, there's a two-part to this case with the reasonable accommodations. We can win on the interaction she had with Carol, even if we lose on the thylake note. I think it's clear that a jury can find that Carol's directive violated the plain terms of the first doctor's note, and she told him that. So that's the interactive process. He said, I don't care, do it, or you can't work here. So that's the first part of the point. Are you arguing that an accommodation has to happen in a certain time in order for it to be valid? I mean, I understand why as a legal strategy you want to have two different accommodations, but do we have to find that? If we find that it's one that is continuing and evolving, can we still find her complaint? I think so, but I don't think a jury has to separate it out that way, because she was injured from the first reasonable accommodation denial on January 7th, because she did what she was told and she further hurt her back, and she wrenched her back by twisting and bending, and she wasn't supposed to. So the jury could say, we find complaint upon that. Now let's take a look at the second reasonable accommodation period when the doctor issued another note, which is slightly different from the first note. The problem with the second note is that it's contradictory. And the second paragraph says, the county doesn't have light duty. That's not really true. We have testimony that there is light duty, and that if you're not capable of performing your duties for any reason, you need to come in with a doctor's note, quote, indicating that you can work with no restrictions. What does that mean? That means no accommodation. You either work or you don't work, even if it's not an essential job requirement. That's the problem with the High League note from January 16th. It has this contradictory second paragraph with an all or nothing directive. If you can't work with restrictions, you can't work here. That's the problem. And she said, no, I need restrictions. Archiving is not an essential requirement. I don't need to archive to do my work. I can do sedentary work like my doctor suggested and still perform my duties as a secretary. That's the problem with the second note. So to answer your question, she can win on one part of the reasonable accommodation. They're going to say that the Hellig Memo says that we're going to give you every accommodation your doctor tells us we should give you. And then beyond that, I think they're saying you're not entitled to any special treatment or light work. Isn't that what the Hellig Memo says? It says these accommodations. It's talking about what the doctor, and again, they're confused, I think, about what the doctor is saying, but they say these accommodations allow you to perform secretarial work as a pert typist consistent with the conditions set by your doctor in the January 8th, 2014 letter. So then I'm saying we don't care what your doctor says. In fact, you said that Carol said to her, I don't care what the doctor note says, but your client in her deposition said that Carol told her that the doctor's not saying that she can't do any filing. So Carol wasn't saying, I don't care what the doctor says. According to your own client, Carol said that the doctor's note says you can't do filing over five pounds. So again, I just think this is an issue of the interactive process and the back and forth, and who's responsible for that. Carol conflated the conditions in the first note by assuming she can do any filing over anything if the file is less than five pounds. And she said no. That's part of the note. He may have made a misinterpretation. Yes, he gets the second note to try to clarify, to try to tell Carol, look, you're wrong. I can't do any filing. But the second note is not perfectly clear either. It's actually worse than the first note. Because the second note, the first paragraph is fine. The first paragraph, if he left it alone, that's fine. I don't know, that's not a great... When it says she's unable to bend, twist, or push any object over five pounds, to me that's not great. The question is, are you just talking... When you say bend, are you talking about in relation to objects of five pounds? Because it doesn't make sense. You don't twist something that's five pounds. I understand that. I understand that. It's just not a great sentence. Well, then we're getting to sort of the heart of our argument here. Or it's something else. You know, we're now getting into the fine points of intent and reasonable accommodation. A jury could say, well, this letter by Heilig, you know, the second paragraph undoes any good that he gave her in the first paragraph by saying a doctor's note indicating you can work with no restrictions. That suggests we're not giving you an accommodation unless you're perfectly able to do anything you want. That's the problem. We're talking summary judgment here. Let the jury determine whether it was a good faith mistake by Heilig. These are lawyers, by the way. These are not, you know, an H.R. department that doesn't know what it's doing. Or the jury could say, wait a minute. They simply don't want to give out reasonable accommodations. Can I ask, is your position that the only reasonable accommodation was relief from all archiving responsibilities? That's a huge part of it. Relief from... There was only one reasonable accommodation. And it was relief. No lifting over five pounds and no bending, twisting. But this is all in the context of archiving. And that's how it all started with archiving. I'm sorry. This is actually important to my thinking. You are taking the position that there was only one reasonable accommodation and that was no archiving. Right? I think so. And that's where the case... Okay. If we find that archiving was an essential function of her job, we can't rule for your client. If you find archiving is an essential part of the job, then we're going to have problems. Because that's really what the issue was during this brief time period. Well, do you notice that it's unusual to be in a posture where there was only one reasonable accommodation? Right? I mean, you can appreciate from an employer's perspective, based on their history, to figure out which ones were. I don't know that... So, is there any precedent for there only being one reasonable accommodation? And that's relief entirely? Since that issue wasn't... Since that issue wasn't briefed, I don't know if there's precedent on that issue. But if we look at the facts here, she was a secretary. It's primarily a sedentary job without any real physical responsibilities. You're answering the phone, you're typing, you're doing whatever. That would be archiving. So I think in this instance, that would be the only real accommodation here because we have testimony that other people can archive too. It's done very sporadic. It's not a pressing concern. Even Carroll testified when he was asked if he thought archiving was essential. But there's no doctor's note that says no archiving. That would be simple enough, but there isn't one that says that, right? Right, but the no lifting over five pounds, she had working in this office. Well, it sounds like it, but that's the reason why we have a process that is required to bring the parties together. And she did say to Carroll, I can't do this because my back is killing me and my note says there's no twisting, there's no bending. Forget about the five pounds for a minute. What are you doing? And he says, just go ahead and do it. She did it and she hurt herself. But it seems to me what you're arguing is that it's up to him to decide whether he's going to give her a reasonable accommodation or not. And if he doesn't, then she's got a claim. He's got a what? Then she's got a claim. No, I missed the first part of the question. If he doesn't on that split second say, okay, you don't have to archive today. And that doesn't seem to be what the interactive process is about. Well, she responded to his directive and that's the interactive response. She says, no, I can't do this. And he's yelling and he's carrying on and he basically says, just do it. She's trying to explain, no, my doctor's note says otherwise. That's the interactive process. I mean, they're in the middle of the workday. He wants her to do something. I mean, I guess there's other ways to have an interactive process. You can put everything aside and think about it for a week. But here we are in the middle of a directive and she said, take a look at my notes. And he had the note and she did it and she hurt herself. That's the problem. Thank you. All right, we'll hear from Ms. Gabor. Can I say that right? Gabor, yes. Good morning, your honors. May I please have the court? Good morning, your honors. May I please have the court? My name is Hope Gabor. And I represent defendants and police. It was a plainly reasonable accommodation that was offered to Ms. DeFolo. When? Well, we argued that both times, it was. The first note says she's not to lift, bend, or twist anything over five pounds. No, the first note says no lifting over five pounds within a separate line. It says no bending, pushing activities. So her position was that that meant no bending means no archiving. Mr. Carr obviously took a different position, but why isn't that an issue? I don't believe it's an issue. I don't believe the archiving would necessarily involve bending or twisting. You can archive without bending? Absolutely, your honor. A box can be placed on a desk. And then how do you put it away? That was not her job to put it away. Tell me what archiving is. Archiving is taking a file, closing it out on the computer, placing it in a box, and she's not to lift the box. She was told by no one certainly not to lift the box. She's not to lift the box if she was told if it was over five pounds. Not even under five pounds. Not her job to lift the box. Mr. Carroll was pretty clear that she was required to lift if it was less than five pounds. The files, your honor, not the box. The box full of files certainly would be more than five pounds. It's probably a banker's box which is filled with a lot of little files weighing under five pounds, so probably the entirety of the box would weigh more than five pounds. What about the time you told her to pick it up off the floor? Not the box, your honor. I know, but her position is no bending. No bending of any type. That's her position based upon the note. I understand. So why does the employer, if they're going to defy a doctor's note, who either has an obligation to go back to contact her doctor as we get another note, rather than just tell her this is the way we interpret the note, you either accept this or you go on medical leave. Why is that not a problem for the county? Well, it's not a problem for the county, your honor, because right after that, Mr. Carroll did have the meeting with all the ADAs in the office. And he was very firm with stating that Mr. Fuller is not to touch anything over five pounds. And said if anything is involved in that, she is not to do it. So can I ask the same question? Sure, your honor. That I asked your colleague. If we treat this as two offenses rather than one, where are you more vulnerable in your opinion? Probably the first one. And that is because of the note bending, right? I think there's some confusion with what that actually meant. If that meant no bending concerning the five pounds or not. But the second note from the doctor did confirm no bending, twisting, pushing any object over five pounds. It doesn't have to be a confirmation. It could have been at one point in time she saw the PA that said your injury is really fresh. Let's see how you're doing right now. You have some restrictions. And then in a future time, we are looking at what those restrictions look like now. They don't have to be a confirmation. It could be she had a limitation and then she had a different limitation because time has passed. So if that's the case, then why didn't you violate the first limitation of the doctor? No. I don't believe it was violated, but assuming arguendo that it was violated, the second accommodation was clearly granted and it was plainly reasonable. The first note said no physical, there was that sentence that kind of strung things together, but then the following sentence says no physical duties at this time. She's going to perform secretarial work, but no physical duties at this time. So again, why isn't that another confirmation that she can't do any archiving? I think that's very much open to interpretation. I know, but doesn't the employer have an obligation at this point? If you're going to tell her you've got to go on medical leave, we think this means you can archive. Why don't they tell her we want a note from your doctor that says, as Judge Sullivan pointed out, no archiving. You can't do any archiving. Wouldn't that be what an employer should do if there's some ambiguity in the doctor's notes rather than tell her this is the way we interpret your doctor's note. You either accept this  Isn't that not the way employers should handle this? Well, the problem is, Your Honor, on January 16th, she put in the second reasonable accommodation request on January 14th. It was not responded to until January 16th, unbeknownst to Mr. Hyland or Mr. Carroll that she left the job never intending to go back. So there was no opportunity for the county to ask her. Well, the January 16th one essentially mirrors what the county's position was all along. You would have a much better position if the January 16th memo said we want to make clear we're not going to make you do any archiving consistent with your doctor's notes and then she never came back to work. They wouldn't have any case, I think, because you would have gone through the interactive process and confirmed that you're telling her no archiving. But this essentially says you have to do archiving under five pounds or you have to go on medical leave. Isn't that what the hell his memo says? No, I don't believe that's what it says. It says you are accommodated under the order of your doctor's orders. And it quotes the doctor's orders. You would not have to deal with any file weighing over five pounds in the performance of your work as clerk typist. So she's reading this, she's like, they're still saying I have to do archiving under five pounds. And then in the last paragraph it says if you're not capable of doing this you need to go on medical leave. So she went on medical leave and you're saying no, she should have come back to work. I'm saying she should have responded to the letter and continued the interactive process, which she did not. Well, wait a minute, what about them not responding to her December 6th email until January 7th during a terse conversation, right? I mean, him asking about the backlog is not responding to her December 6th email, right? No, the email was responded to immediately, Your Honor, where Mr. Carroll wrote back and said I don't want you to hurt yourself. Let's see what your doctor says. Please provide me with a note. So why is that not saying we're not going to give you the accommodations you want? That didn't say that at all. It said let's see what happens. Let's see what the doctor's note says. So that is I am not giving you an accommodation until I get more information, right? No, he basically said don't do anything. Don't lift anything, don't do anything. I don't want you to hurt yourself. Don't do anything until we get a note from your doctor. Can you give me the best argument you have for why archiving was an essential function? Oh, sure. All of the clerk typists do the archiving. Mr. Carroll testified to that. Mr. Hyland testified to that. The ABA that was deposed as well testified to that. There's no one else that does it. The best argument you have is they all do it? It's the job title of a clerk typist. Every clerk typist does it. It's not in the job description. What is in the job description, Your Honor, is does related work as required. I'm looking at Joint Appendix 990. And sorts, indexes, and files, documents, reports, correspondence, and other material. It doesn't have to be all inclusive. Case law states that it has to do with practice in the workplace, and other factors are considered. It doesn't have to be all inclusive. I don't have it in front of me. Someone's deposition, I don't know if it was Carroll, said it's a very minimal part of the job. I think what he meant by minimal was that there are more important things that have to be done. So, was archive the last thing that had to be done? Sure. Was it done in a fair time? Well, but if it's all a priority, then how does that make it essential? Well, because when files are closed out by the ADA, then they're placed to be archived. They were just piling up, and piling up, and piling up, and piling up. That's not the same question. The same question is, as I heard you, you're saying that the best evidence, or the best argument you have for that being essential is that there's a custom of everybody doing it. That's correct. But note that the district judge didn't find one way or the other whether it's an essential function. She did not get to that point because she determined that since the accommodation offer was plainly reasonable, she would not have to get to the point of considering whether it was an essential function of her job or not. We should be doing that here based on the record? I'm going to ask your adversary the same question. No, Your Honor. No. Well, I do believe, I do argue it is an essential function of the job, and I do support that in my deposition testimony and my plaintiff's own testimony. She's one that instituted the interactive process. Stating, only for archiving. I can't do the archiving. I would like somebody else to do it. So the interactive process was started by her specifically concerning archiving. Obviously, she thought it was an essential function of her job. Otherwise, she wouldn't have even addressed it. I don't really understand that argument. When someone requests an accommodation, they're conceding that it's essential to their job. They could be told to do something that's not essential, and they're objecting to it because they have a disability, right? That can't be. She knew archiving.